439 So.2d 896 (1983)
Joe HAYES, Appellant,
v.
STATE of Florida, Appellee.
No. 82-436.
District Court of Appeal of Florida, Second District.
September 16, 1983.
Rehearing Denied November 2, 1983.
*897 Jerry Hill, Public Defender, and Michael E. Raiden, Asst. Public Defender, Bartow, for appellant.
Jim Smith, Atty. Gen., Tallahassee, and William I. Munsey, Jr., Asst. Atty. Gen., Tampa, for appellee.
CAMPBELL, Acting Chief Judge.
Joe Hayes appeals his convictions for burglary and sexual battery. He challenges the admission into evidence at his trial of fingerprints taken from him during a police investigation and of tennis shoes removed from the front porch of his home during the course of that same investigation. We find no error, and we affirm.
Early on the morning of May 13, 1980, a man entered the victim's home and raped her. When the man left, she called the police, and when the officers arrived, they found latent fingerprints on the doorknob of the victim's bedroom door. The police also found a herringbone pattern tennis *898 shoe print on the east side of the victim's front porch.
The police continued investigating this case for the next several weeks, and with the help of the victim, they prepared a composite drawing of the assailant that yielded the following description: A slender, white male with short brown hair. The police officers conducted field interviews with thirty to forty men who generally fit that description. One of the men interviewed was appellant.
Gradually, appellant emerged as a possible suspect in this and several other sexual battery cases, and so Detectives Shoup and Brady, along with the assistant police chief of Punta Gorda, went to appellant's home to obtain his fingerprints. They intended to compare these prints with the latent prints lifted from the victim's home. A search warrant was not obtained prior to going to appellant's home.
Detective Shoup later testified that they only wanted to obtain appellant's fingerprints, but he added that they were prepared to arrest appellant if he refused to cooperate because they believed they already had sufficient probable cause to do so. The officers never entered appellant's home but talked to him on his front porch. He said he would rather go with the officers to the station than be arrested. It is, therefore, at best, highly questionable that appellant's accompanying the officers to the station could be considered voluntary. While the officers stood on the front porch, they also noticed a pair of herringbone pattern tennis shoes lying on the front porch.
Appellant went to the station with the officers and allowed them to take his fingerprints. When the police compared these prints with the latent prints removed from the crime scene, they found that the prints matched, and appellant was thereafter arrested for and later charged with burglary and sexual battery.
Appellant sought, both before and during trial, to suppress the fingerprints and tennis shoes seized during the police investigation. The trial judge refused to suppress these articles of evidence, and the jury eventually found appellant guilty as charged.
Initially, we note that even though the officers did not have a warrant, Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), does not apply here since the discussion about fingerprints and the seizure of the tennis shoes occurred on the front porch of appellant's home. Because the officers found the shoes on appellant's front porch, the trial court did not err in admitting the shoes into evidence. State v. Rickard, 420 So.2d 303 (Fla. 1982), demonstrates that these shoes clearly were not in a constitutionally protected area at the time the officers saw them and so were subject to seizure.
We move then to a consideration of the stop of appellant and the seizure of his fingerprints, and we begin and end with an examination of the fourth amendment. Generally, to be valid under the fourth amendment, a search and seizure should be made only pursuant to a warrant that is based upon probable cause. In fact, a warrantless search is per se invalid unless it falls within one of the carefully defined exceptions to the warrant requirement. Engle v. State, 391 So.2d 245 (Fla. 5th DCA 1980); Ulesky v. State, 379 So.2d 121 (Fla. 5th DCA 1979).
However, law enforcement officials frequently make a determination of probable cause, based upon the facts before them, that is later judicially sustained. Here, the police officers believed they had probable cause sufficient to arrest appellant before they obtained his fingerprints. However, we conclude that the officers did not have probable cause at that point in the investigation. The officers were seeking an intended, investigatory confrontation, an encounter in which law enforcement officials frequently engage. Such confrontations may occur in the context of preventing a crime from occurring, or, as here, where officers are involved in an ongoing investigation in an effort to solve a particular crime. At the time the officers approached appellant's home, they had only *899 the partial description given in the composite drawing to guide them and the knowledge that appellant was evidently a suspect in some other sexual batteries. These factors were alone insufficient to give the officers probable cause to arrest appellant. Since they did not have probable cause to arrest appellant, we must determine whether appellant's encounter with the police may be lawfully explained in another manner. To answer this question, we still must examine the fourth amendment because clearly the strictures of that amendment apply during the investigatory as well as the accusatory or arrest stage of the criminal process. Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). However, to resolve this issue, we must examine that amendment from another perspective.
Not all searches and seizures are invalid simply because probable cause is lacking. In Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the United States Supreme Court upheld a policeman's stop and frisk of a person whom he suspected of being involved in criminal activity. In reaching its conclusion, the Court set out a very limited context in which the probable cause requirement of the fourth amendment does not apply. The focus for the Court in Terry and the focus which we follow here is whether the official governmental intrusion was reasonable. This focus is dictated by the very language of the amendment because it is beyond peradventure that the fourth amendment protects citizens from unreasonable searches and seizures, not all searches and seizures. Terry; Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960); Gaskins v. State, 89 So.2d 867 (Fla. 1956); State v. White, 312 So.2d 475 (Fla. 4th DCA 1975); Gilbert v. State, 289 So.2d 475 (Fla. 1st DCA), cert. denied, 294 So.2d 660 (Fla. 1974); Webster v. State, 201 So.2d 789 (Fla. 4th DCA 1967). And when the probable cause requirement of the fourth amendment is not implicated in the facts of a particular case, courts must then examine all the attendant facts and circumstances involved to determine whether that governmental intrusion was reasonable for fourth amendment purposes. United States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); Longo v. State, 157 Fla. 668, 26 So.2d 818 (1946); Starks v. State, 108 So.2d 788 (Fla. 2d DCA 1959). In undertaking this examination, a court must compare and then balance the competing interests involved. Brignoni-Ponce; Terry; Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).
The public, and through it the police, has an understandably strong interest in effective detection and prevention of crime. As the Court stated in Terry, "it is this interest which underlies the recognition that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to arrest." 392 U.S. at 22, 88 S.Ct. at 1880, 20 L.Ed.2d at 906. This legitimate interest must be balanced in turn with the individual's interest in being free from unjustified, humiliating physical intrusions as well as against his overall interest in privacy. In making this inquiry under the fourth amendment, courts must be cognizant that the analysis must proceed at two different levels. First, there must be a seizure of the individual by law enforcement officials. Then, there must be a search for and a seizure of evidence. United States v. Dionisio, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973).
Appellant clearly was seized for purposes of the fourth amendment when the officers accosted him on his front porch and asked for his fingerprints. Because this was the sole reason for this intended investigative confrontation and because no interrogation occurred, we conclude that under the narrow circumstances of this case, this was a reasonable seizure or detention of appellant under the fourth amendment.
It does not matter that the officers had to take appellant to the police station to actually obtain his prints. Whether the *900 prints were taken at the station or on appellant's front porch is immaterial. State v. Merklein, 388 So.2d 218 (Fla. 2d DCA 1980), petition for review denied, 392 So.2d 1377 (Fla. 1981), illustrates why this is so. There, sheriff's deputies were responding to an attempted robbery that occurred on Siesta Key. One deputy broadcast a BOLO describing the getaway car and the two suspects inside. Other deputies covered the bridges leading to the mainland and stopped several vehicles that fit the description in the BOLO. The defendant and his companion were stopped, and then they were held until another deputy could transport the victim and the witnesses to the scene for purposes of identification. This court found that this was a reasonable detention. "It is permissible to detain suspects for a reasonable time to investigate the circumstances warranting an investigatory stop as well as any suspicious circumstances produced by the stop." 388 So.2d at 219.
Like the detention in Merklein, the detention here occurred during the investigatory stage of the criminal process. In these circumstances, it does not matter who is moved, the victim or the suspect. By way of analogy and in support of the view we follow here, it should be noted that in Pardo v. State, 429 So.2d 1313 (Fla. 5th DCA 1983), the defendant was removed from the scene of an accident, taken to a hospital, and there had a blood specimen taken from him. The specimen was later used against him in his trial for manslaughter while driving while intoxicated. The movement to the hospital prior to taking the blood specimen did not render the specimen inadmissible at trial. Where there is a reasonable suspicion sufficient to justify a stop or detention, it is permissible to stop or detain an individual reasonably long enough to allay or confirm suspicions so as to cause either release or arrest of that individual. This principle applies here because if it is reasonable to take a suspect to a hospital for a blood test to obtain evidence in regard to a manslaughter charge, it seems to us it is also reasonable to take a suspect in a rape case to the police station to obtain fingerprint comparisons.
Since we conclude that appellant was lawfully detained, or seized for purposes of the fourth amendment, we move to the next level to determine whether the taking of appellant's fingerprints was likewise a reasonable search and seizure under the fourth amendment.
In Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), the United States Supreme Court held that fingerprints obtained from the petitioner in that case had been seized during a detention violative of the fourth and fourteenth amendments. The petitioner was one of twenty-four black youths taken to police headquarters during an investigation in a rape case. The victim had described her assailant only as a young black male. During the detention, the youths, including the petitioner, were fingerprinted, questioned, and released. The petitioner was detained again a few days later, jailed, given a lie detector test, and fingerprinted again. The Court reversed, noting that there had been "no attempt ... to employ procedures which might comply with the requirements of the Fourth Amendment." 394 U.S. at 728, 89 S.Ct. at 1398, 22 L.Ed.2d at 681. Although not necessary to the decision in Davis, the Court addressed the question of a detention solely for the purpose of obtaining fingerprints:
Detentions for the sole purpose of obtaining fingerprints are no less subject to the constraints of the Fourth Amendment. It is arguable, however, that, because of the unique nature of the fingerprinting process, such detentions might, under narrowly defined circumstances, be found to comply with the Fourth Amendment even though there is no probable cause in the traditional sense. See Camara v Municipal Court, 387 U.S. 523, 18 L Ed 2d 930, 87 S Ct 1727 (1967). Detention for fingerprinting may constitute a much less serious intrusion upon personal security than other types of police searches and detentions. Fingerprinting involves none of the probing into an individual's *901 private life and thoughts that marks an interrogation or search. Nor can fingerprint detention be employed repeatedly to harass any individual, since the police need only one set of each person's prints. Furthermore, fingerprinting is an inherently more reliable and effective crime-solving tool than eyewitness identifications or confessions and is not subject to such abuses as the improper line-up and the "third degree." Finally, because there is no danger of destruction of fingerprints, the limited detention need not come unexpectedly or at an inconvenient time. For this same reason, the general requirement that the authorization of a judicial officer be obtained in advance of detention would seem not to admit of any exception in the fingerprinting context.
We have no occasion in this case, however, to determine whether the requirements of the Fourth Amendment could be met by narrowly circumscribed procedures for obtaining, during the course of a criminal investigation, the fingerprints of individuals for whom there is no probable cause to arrest.
394 U.S. at 727-28, 89 S.Ct. at 1397-98, 22 L.Ed.2d at 681. The Court in Davis did not need to decide that question because, under the facts of that case, it was unnecessary to do so. The Court ruled that the fingerprint evidence was inadmissible explicitly because the police officers interrogated the petitioner in addition to merely taking his fingerprints.
The instant case poses the very question left unanswered by the Court in Davis, and we note that this issue has not been directly addressed since the Davis decision. See United States v. Thomann, 609 F.2d 560 (1st Cir.1979). Our study of Davis and its progeny has revealed that the precise holding of Davis, which we have just described, as well as the meaning and import of that decision, has been misconstrued. See Bacon v. United States, 449 F.2d 933 (9th Cir.1971). See also Hamrick v. Wainwright, 465 F.2d 940 (5th Cir.1972). For example, in Dunaway v. New York, the Court, while again asserting the notion that it is permissible under certain circumstances to take fingerprints absent probable cause, seemed to imply in an earlier paragraph of the same opinion that it has rejected that very argument in Davis.
Of course, the Court did not reject that argument in Davis, and in any event, the facts in Dunaway in no way involved or concerned the taking of a suspect's fingerprints during the course of an ongoing criminal investigation. There, the police, during the course of a murder investigation, took the petitioner to the station, placed him in an interrogation room, gave him Miranda[1] warnings, and questioned him. He was never told he was under arrest, and the officers did not obtain a warrant because they did not believe they had probable cause. Eventually, he made an incriminating statement which was later determined to be the fruit of an illegal detention. Thus, Dunaway is inapposite to the instant case, except insofar as it stands for the proposition we earlier stated; the fourth amendment applies to the investigatory as well as the accusatory stage of the criminal process.
Our state courts have also touched on the issue before us on occasion; however, each case is factually distinguishable and, therefore, inapplicable to the instant case. In Anderson v. State, 241 So.2d 390 (Fla. 1970), vacated, 408 U.S. 938, 92 S.Ct. 2868, 33 L.Ed.2d 758 (1972),[2] the defendant was arrested and fingerprinted and later obtained counsel. Later, the police took his palmprint without advising him of his rights. The court held that this action did not violate the defendant's right to be free from self-incrimination. Citing Davis, and apparently misconstruing it, the court in *902 dicta indicated that taking the fingerprints of a suspect before arrest and without probable cause was violative of the fourth amendment. However, as we have indicated, Davis, in fact, left open that precise question, and so the language in Anderson, being dicta by which we are not bound, does not prevent us from reaching and deciding that question. Years ago, Mr. Justice Whitfield explained why this is so:
It is a maxim not to be disregarded, that general expressions in every opinion are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit where the very point is presented for decision. The reason of this maxim is obvious. The question actually before the Court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated. It cannot be reasonably expected that every word, phrase or sentence contained in a judicial opinion will be so perfect and complete in comprehension and limitation that it may not be improperly employed by wresting it from its surroundings, disregarding its context and the change of facts to which it is sought to be applied, as nothing short of an infinite mind could possibly accomplish such a result. Therefore, in applying cases which have been decided, what may have been said in an opinion should be confined to and limited by the facts of the case under consideration when the expressions relied upon were made, and should not be extended to cases where the facts are essentially different. When this rule is followed, much of the misapprehension and uncertainty that often arise as to the effect of a decision will be practically avoided.
What is said in an opinion upon a point not raised or properly involved cannot control in a subsequent case where the very point is presented for decision. Union Tank Line Co. v. Wright, 249 U.S. 275 [39 S.Ct. 276, 63 L.Ed. 602], 39 Sup.Ct. Rep. 276. General words used in a judicial opinion should be construed with such limitations as are required by a refernce (sic) to the facts in the case.
Ex Parte: Ernest Amos, 93 Fla. 5, 20-22, 112 So. 289, 294-95 (1927) (en banc) (Whitfield, J., concurring) (citations omitted). This old and well established judicial principle is still valid and has been consistently applied. Ard v. Ard, 395 So.2d 586 (Fla. 1st DCA 1981); Bunn v. Bunn, 311 So.2d 387 (Fla. 4th DCA 1975); Weisenberg v. Carlton, 233 So.2d 659 (Fla. 2d DCA), cert. denied, 240 So.2d 643 (Fla. 1970); Booth v. Mary Carter Paint Co., 182 So.2d 292 (Fla. 2d DCA 1966).
In Kinsler v. State, 360 So.2d 24 (Fla. 2d DCA 1978), the defendant allowed police officers to take a footprint impression from him, and this court, relying on Davis and the Anderson dicta, found that this action violated the defendant's fourth amendment rights. However, there, a key factor for the court was the defendant's status as a parolee and his parole officer's statement that if he refused to submit he would be in violation of his parole. Notwithstanding, to the extent that Kinsler followed the dicta in Anderson which sprang from an erroneous application of Davis, we hereby recede from that portion of our Kinsler decision.
There are a number of cases that address situations similar to the one presented here, and having examined these cases, we conclude that the fingerprints were properly seized and, therefore, properly admitted into evidence against appellant.
In United States v. McCarthy, 297 F.2d 183 (7th Cir.1961), cert. denied, 369 U.S. 850, 82 S.Ct. 933, 8 L.Ed.2d 9 (1962), the court affirmed McCarthy's bank robbery conviction. He argued that prints taken from him by an F.B.I. agent who persuaded him to go downtown and give his prints should be suppressed because they had been seized in violation of the fourth amendment. The court, in affirming, held otherwise, and this case seems to represent the clearest example of the situation left open in Davis, aside *903 from the one presented here. Cases decided after Davis that have touched on this issue and similar ones dealing with physical evidence have also allowed such evidence to be admitted.
In United States v. Sanders, 477 F.2d 112 (5th Cir.), cert. denied, 414 U.S. 870, 94 S.Ct. 88, 38 L.Ed.2d 88 (1973), the court affirmed the admission into evidence of palmprints taken from Sanders. The court noted that at the time the palmprints were taken, Sanders was lawfully in custody on another unrelated matter. Appellant was likewise lawfully seized. As far as the actual taking of the palmprints, the court concluded that taking palmprints, like the taking of fingerprints here, is much less intrusive than an interrogation or a full-blown search of the person.
In United States v. Harris, 453 F.2d 1317 (8th Cir.1972), cert. denied, 412 U.S. 927, 93 S.Ct. 2755, 37 L.Ed.2d 154 (1973), the court found no error in the admission of handwriting exemplars given by the defendant. The defendant there was a suspect in a case involving the theft of a check which he had endorsed. Some postal inspectors visited Harris in his home and in the presence of his parents informed him of the ongoing investigation and asked him for his handwriting sample. The court found that the postal inspectors' conduct was reasonable because Harris was never under any type of pressure, coercion or duress. The court stated with reference to the inspectors' conduct that "it appears to be the most logical and reasonable course of conduct to pursue." 453 F.2d at 1321. Likewise here, the officers, in attempting to solve a serious crime, tried to tie up the strongest lead they had, fingerprints, with a suspect.
In United States v. Sechrist, 640 F.2d 81 (7th Cir.1981), the court affirmed the earlier denial of Sechrist's motion to suppress his fingerprint evidence. The court noted that like the defendant in Sanders, Sechrist was lawfully in custody on another matter at the time his fingerprints were taken. Since he was, therefore, lawfully seized for fourth amendment purposes, like appellant here, the court examined only the taking of the fingerprints from Sechrist and concluded that the process was so minimally intrusive that it was wholly reliable and, therefore, did not violate the fourth amendment.
Therefore, it is clear from McCarthy, Harris, Sanders and Sechrist that such a minimal intrusion upon appellant in this case did not infringe any of his fourth amendment rights. Though he was not in legal custody, he was lawfully and reasonably "seized" for purposes of the fourth amendment. This seems to us a logical extension of Terry. Unlike the petitioner in Davis, there is no evidence that he was subjected to interrogation.
Finally, we note that in McCarthy, Harris and Sanders, the courts did not require that there be judicial approval or authorization prior to obtaining prints or handwriting samples. Neither do we conclude that there should be such intervention for we do not deal here with a question of probable cause. Requiring this type of judicial intervention at this stage of a criminal investigation would unnecessarily hamper efforts both to prevent and to solve crimes. Carried to its logical extreme, such a rule would render Terry a complete nullity.
It would appear by implication from Davis and many other cases that had the officers arrested appellant under a mistaken belief that they had probable cause, taken him to the station, booked him, fingerprinted him, and nothing more, the fingerprints would be admissible in evidence even though the arrest was later invalidated. Thus, it would seem that where, as here, appellant was not arrested, there was no probable cause but only a reasonable suspicion of criminal activity, and where appellant was, without force being used, persuaded or even coerced into going with the officers and giving his fingerprints, and nothing more, those prints would also be admissible.
However, this decision should not in any way be construed as giving law enforcement officers carte blanche to fingerprint every person suspected of committing a *904 crime currently under investigation. We hold only that under the narrow facts of this case, the government's legitimate interest in law enforcement, specifically, the solving of a violent crime, outweighed appellant's interest in privacy as defined by the fourth amendment.[3] The initial seizure of appellant was reasonable as was the seizure of his fingerprints. As we have earlier stated, the seizure of the tennis shoes presents no fourth amendment problems.
We have examined the remaining points on appeal, and we find them to be without merit.
AFFIRMED.
SCHOONOVER and LEHAN, JJ., concur.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] The case was vacated "insofar as it leaves undisturbed the death penalty imposed... ." 408 U.S. at 845, 92 S.Ct. at 2845, 33 L.Ed.2d at 744. See Stewart v. Massachusetts, 408 U.S. 845, 92 S.Ct. 2845, 33 L.Ed.2d 744 (1972).
[3] Although we have not discussed it, obviously the fourth amendment is made applicable to the states by operation of the fourteenth amendment.